IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CRIMINAL ACTION NO.
1:15-CR-178-RWS-LTW

HUMBERTO VEGA-GUTIERREZ,

Defendant.

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This case is before the court on Defendant Humberto Vega-Gutierrez's Renewed Motion to Suppress Evidence Seized Pursuant to Warrant and Renewed Motion to Suppress Statements.[1]  (Docs. 140, 141).  For the reasons that follow, Defendant Vega-Gutierrez's Motion to Suppress Evidence Seized Pursuant to Warrant should be **DENIED**.  (Doc. 140).  Defendant Vega-Gutierrez's Renewed Motion to Suppress Statements should be **GRANTED IN PART AND DENIED IN PART**.  (Doc. 141).  Because there are no more motions or other matters to address for Defendant Vega-Gutierrez, the undersigned certifies Defendant Vega-Gutierrez ready for trial.

---

[1] Although Defendant Vega-Gutierrez had previously filed a motion seeking to suppress identification testimony (Doc. 29), the Government subsequently advised counsel for Defendant that it does not intend to introduce any identification testimony based on the out-of-court identifications, and that motion was moot.  (Tr. of Apr. 11, 2016 Evid. Hrg. 3).  Defendant's counsel agrees that the motion is now moot.  (Tr. 3).

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
## SEIZED PURSUANT TO WARRANT

On January 19, 2016, the Grand Jury charged Defendant Humberto Vega-Gutierrez ("Defendant") in a Superceding Indictment with conspiring to knowingly and intentionally possess with the intent to distribute, possession with intent to distribute, and distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), 846, and 18 U.S.C. § 2. (Doc. 59). Defendant was also charged with possession of a firearm by an illegal alien in violation of 28 U.S.C. §§ 922(g) and 924(a). (Id.). Defendant argues evidence obtained from the search of his home at 1508 Colony Court ("the Target Residence") should be suppressed because information provided within the affidavit submitted in support of the warrant was not sufficient to establish probable cause. In support, Defendant contends that the affidavit did not provide a factual basis to establish a connection between the Target Residence and criminal activity because the majority of the affidavit discusses activity that occurred at other residences. Defendant further argues the evidence used to connect the Target Residence to criminal activity occurred in April 2014, more than a year before the search warrant was executed, and is therefore too stale to establish probable cause.

This Court finds that the affidavit submitted in support of the search warrant established probable cause for the search of the Target Residence. In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resulting from warrants issued without

2

probable cause, the issuing magistrate "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Miller, 24 F.3d 1357, 1361 (1994). "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361. "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361. Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location. United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).

Here, it is clear that the affidavit supplied the probable cause to search the Target Residence. Contrary to Defendant's argument, the affidavit does connect the Target Residence to criminal activity. Specifically, on July 1, 2015, the Government sought a warrant to search the Target Residence for controlled substances, books, ledgers, receipts, papers related to drug trafficking, currency and financial instruments, money counters, photographs, cellular telephones, calenders, firearms, ammunition, financial

3

statements, etc. (Doc. 31-2). Agent Marlon T. Moye's Affidavit establishes through the interception of telephones used by Defendant Vega-Gutierrez and his son, Israel Vega-Perez, as well as other investigatory methods, that in 2014, Defendant and his son utilized stash houses located at Chamblee-Tucker Road in Tucker, Georgia and Caesars Way in Norcross, Georgia for distributing methamphetamine. (Doc. 31-1, at ¶¶ 15, 17-34). Through court authorized telephone intercepts, agents learned that a woman from Kentucky was traveling to Atlanta to purchase methamphetamine from Vega-Perez and Defendant. (Doc. 31-1, at ¶ 17). By text, Vega-Perez instructed the woman to travel to the Caesars Way location. (Doc. 31-1, at ¶ 17). Agents observed a woman with a Kentucky license plate arriving at the Caesars Way location, traveling in tandem with Vega-Gutierrez to the Chamblee-Tucker Road location, and leaving the Chamblee-Tucker Road residence carrying a plastic bag. (Doc. 31-1, at ¶¶ 17-19). Agents later intercepted the car with the Kentucky plates and found 156.6 grams of methamphetamine in the woman's car and 25.2 grams on her person. (Doc. 31-1, at ¶¶ 19-20). Though other court-authorized intercepts, agents also learned that a man from Kentucky was traveling to Atlanta to purchase methamphetamine from Vega-Perez. and Vwga-Gutierrez. (Doc. 31-1, ¶ 21). Agents later observed a maroon Nissan Altima with a Kentucky license plate parked in the driveway at the Chamblee-Tucker Road location. (Doc. 31-1, ¶¶ 22). Based on the court-authorized intercepts, agents learned that the man was with Vega-Gutierrez and was testing the methamphetamine to assess its quality and that once the man approved the quality, Vega-Perez ordered additional

4

methamphetamine from his source of supply. (Doc. 31-1, at ¶ 22). About thirty minutes later that night, agents observed a man arrive at the residence with a plastic bag which appeared to be holding substantial weight and watched the man leave with a plastic bag that was light in weight. (Doc. 31-1, at ¶ 23). After agents watched the man leave, intercepted calls showed that Vega-Perez and the man with the Kentucky license plate agreed upon a price. (Doc. 31-1, at 24). The Georgia State Patrol later stopped the Nissan Altima, searched the vehicle and found 945.2 grams of actual methamphetamine. (Doc. 31-1, at ¶ 25). Agents observed similar transactions in 2014 at the Ceasars Way location and law enforcement officers recovered methamphetamine from vehicles which had left that location. (Doc. 31-1, at ¶¶ 26-29, 33-34).

After establishing that Defendant and his son engaged in a pattern of utilizing houses to facilitate drug sales, Agent Moye connected drug transaction activity to the Target Residence as well. Georgia Power records for the Target Residence show that the account holder for services to the residence is Defendant Vega-Gutierrez. (Doc. 31-1, at ¶ 38). Consistent with the reports of activities on Chamblee-Tucker Road and Caesar's Way, a confidential source told DEA agents that he or she had purchased one ounce of methamphetamine from Defendant Vega-Gutierrez on January 19, 2015, and that he or she had traveled to the Target Residence to purchase methamphetamine from Defendant Vega-Gutierrez eight different times in the past. (Doc. 31-1, at ¶ 36). Additionally, on July 1, 2015, a confidential source, at the agents' instruction, placed a recorded phone call to Vega-Perez and ordered one ounce of methamphetamine. (Doc.

5

31-1, at ¶ 39).  Vega-Perez instructed the confidential source to meet Vega-Gutierrez at the Target Residence.  (Id.).  The confidential source arrived at the Target Residence around 5:54 p.m., entered the residence, and exited the residence two minutes later. (Id.).  The confidential source paid Vega-Gutierrez $700 for methamphetamine he or she purchased. (Id.).  The confidential source turned over to agents approximately one ounce of a substance that field tested positive for the presence of methamphetamine.  (Id.). These incidents clearly connect the Target Residence to criminal activity and demonstrate that there was a fair probability that contraband and evidence of a crime would be found at the Target Residence.  Here, not only did the confidential source tell the agents that he or she had purchased drugs at the Target Residence eight times in the past, but also, based on the Government's investigation, it is reasonably inferred that the confidential source purchased methamphetamine from the Defendant at the residence on the day or the day before the warrant was signed.[2]  Accordingly, the Government has established that the affidavit in support of the warrant application supplied probable cause in support of the search of the Target Residence.  United States v. Roundtree, 299 F. App'x 905, 907 (11th Cir. 2008) (holding that it was "clear that a properly executed controlled buy . . . is sufficient, standing alone, to establish probable cause"); United States v. Horne, 198 F. App'x 865, 871 (11th Cir. 2006) (explaining that it is common sense that a residence contains drugs when a person enters the residence with no drugs and exits approximately one minute later with drugs); United States v. Wilkerson, No.

---

[2]  The affidavit in support of the warrant, although dated July 1, 2015, bears a file stamp date of July 2, 2015.

3:10cr075-WHA, 2010 WL 4622463, at *2 (M.D. Ala. Nov. 5, 2010).

Defendant argues the evidence relied upon in support of the warrant did not establish probable cause because it was stale.  In support, Defendant contends that the affidavit was almost entirely comprised of information from the first half of 2014.  The probable cause needed to obtain a warrant must exist at the time surveillance is authorized.  United States v. Harrington, 204 F. App'x 784, 786 (11th Cir. 2006) (citing United States v. Domme, 753 F.2d 950, 953 (11th Cir.1985)); United States v. Harris, 20 F.3d 445, 450 (11th Cir.1994).  Information must be timely for probable cause to exist.  United States v. Green, 40 F.3d 1167, 1172 (11th Cir. 1994).  A determination as to whether information is stale is made on the particular facts of each case.  Roundtree, 299 F. App'x at 907 (citing United States v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000)).  There is no particular time limit for when information becomes stale.  Roundtree, 299 F. App'x at 907; Bervaldi, 226 F.3d at 1265.  In this case, the information in the warrant necessary to establish probable cause is not stale because based on the information in the warrant, it is reasonably inferred that a drug transaction occurred in the residence on the very day or the day before the warrant application was submitted. (Doc. 31-1, at ¶ 39).  Thus, even if portions of the information in the affidavit refers to criminal activity at the Target Residence in the past, it is apparent that the criminal activity continued through the time the warrant application was submitted.  Harrington, 204 F. App'x at 787 (explaining that even if some information is stale, the staleness is not fatal where the government's affidavit updates, substantiates, or

7

corroborates the stale material) (citing <u>United States v. Jiminez</u>, 224 F.3d 1243, 1249 (11th Cir. 2000)).  Thus, the new information received within a day of the warrant application corroborated and updated any less recent information about criminal activity occurring in the Target Residence.  Accordingly, Defendant's Motion to Suppress Evidence Seized Pursuant to Warrant should be **DENIED**.  (Docs. 31, 140).

### MOTION TO SUPPRESS STATEMENTS

Defendant contends that statements he made to Task Force Officer Robert Keim and Special Agent Moye should be suppressed because his rights were violated when they interrogated him.  Defendant argues his initial statements to Task Force Officer Keim should be suppressed because they were made without the benefit of <u>Miranda</u> warnings while he was in custody.  Specifically, Defendant points out that his statements to Task Force Officer Keim that he was only a "little drug dealer," in response to Task Force Officer Keim's comments regarding his occupation "other than drug dealer" were elicited without the benefit of <u>Miranda</u> warnings and were likely to elicit an incriminating response.  Defendant further contends that as a result, subsequent statements he gave to Special Agent Moye were tainted even though they occurred after he was read his <u>Miranda</u> warnings.  Additionally, Defendant argues the circumstances of his arrest rendered all of his statements involuntary because the circumstances were inherently coercive and intimidating.

I.   **FACTUAL BACKGROUND**

Special Agent Marlon Moye, who has served as a Special Agent with the Drug

8

Enforcement Administration since 2009, executed a search warrant, arrest warrant, and seizure warrant at Defendant Vega-Gutierrez's residence at 1508 Colony Court in Norcross. (Tr. of Apr. 11, 2016 Evid. Hrg., hereinafter "Tr.," 4-5). Special Agent Moye and approximately nineteen members of the Crime Lab Team[3] as well as officers from the Georgia State Patrol, Department of Public Safety, and HIDTA Group[4] arrived at Defendant's residence a little after 6:00 a.m. while it was still dark. (Tr. 5-6). In total, approximately twenty-five law enforcement officers were at the scene. (Tr. 37). The Crime Lab Team members were armed with AR-15 rifles and semi-automatic pistols and were dressed in green battle dress uniforms similar to what the army wears, with boots, helmets, and kevlar vests which read DEA police on the front and the back. (Tr. 6-7). The Georgia State Patrol and the Georgia Public Safety officers' roles were to handle traffic, and they were not expected to have any contact with the Defendant that day. (Tr. 7-8). The HIDTA task force officers were there to assist with the evidence collection and to transport Defendant once he was in custody. (Tr. 8). Most of the HIDTA task force officers were dressed in tan or black BTUs, wearing khaki pants, vests, and a black polo or t-shirt. (Tr. 9). Officers were positioned at the corners of the house with their guns drawn and pointed at potential threat areas such as windows, doors, garages, and

---

[3] The Crime Lab Team is similar to a SWAT Team. It is a special response team that is utilized to execute arrest and search warrants. (Tr. 6).

[4] HIDTA agents are members of the High Intensity Drug Trafficking Area task force and they investigate drug trafficking organizations and disrupt and dismantle such organizations. (Tr. 8). HIDTA task force officers are agents and officers from metro police and sheriff's departments. (Tr. 8).

9

any location from which a person could shoot a gun. (Tr. 10-11). Twelve officers were lined up along the sidewalk area at the front of the house and they had a ram with them. (Tr. 10-11).

On each side of the front door, there were two plate windows that ran the length of the front door that were somewhat opaque and distorted the vision of people who looked into the house from the outside. (Tr. 12, 39). Nevertheless, the officers could see clearly into the house. (Tr. 39). Three officers stood on the platform at the front door, with Special Agent Moye on the right side and the other two officers on the left side who had their weapons pointed at the side window and the front door. (Tr. 12-13). Special Agent Moye knocked on the door and announced their presence in English. (Tr. 13). At the same time, a suburban that the officers brought to the scene was equipped with a P.A. system on which a Spanish speaker announced in Spanish, "Come out with your hands up, search warrant." (Tr. 13). During this time, police lights were also flashing. (Tr. 13).

Approximately a minute passed, and Special Agent Moye observed a light come on in the hallway leading down to the foyer, and Defendant, who was only wearing his white underwear, walked down three flights of stairs into the foyer area. (Tr. 14). Defendant moved slowly and tentatively. (Tr. 14). Defendant looked through the window and at the door, bypassed the door area, and went into the kitchen, which was off to the left. (Tr. 14). Defendant went out of view for a couple of seconds while the officers were still knocking and announcing their presence. (Tr. 14). Special Agent

10

Moye next observed Defendant walk back near the corner of the kitchen where he reached down and opened a cabinet, removed something in his hands which seemed to be a container of some sort. (Tr. 14-15). Special Agent Moye believes that by that point, the officers had been knocking for approximately two or three minutes, and he became concerned that Defendant was either going to get a handgun or some type of weapon, that he was going to destroy evidence, or that he might flee. (Tr. 15). Accordingly, the officers at the front called up the "ram guy" who forced the door open. (Tr. 16). Special Agent Moye could not see the Defendant, but the officers continued to give commands for him to come to the door. (Tr. 16). Approximately twelve members of the Crime Lab Team entered the residence to execute the warrant. (Tr. 37).

After another fifteen or thirty seconds, Defendant emerged from the kitchen and did not have anything in his hands. (Tr. 16). The officers made gestures and spoke to Defendant in English and a Spanish-speaking officer gave him commands in Spanish. (Tr. 16). Defendant had a "glazed look on his face," but appeared to understand. (Tr. 41, 42). Defendant walked to the officers slowly and in a non-threatening manner. (Tr. 16). A team member pulled Defendant out of the house so that the officers could enter to clear the house of threats. (Tr. 17-18). Defendant was handcuffed with his hands behind his back, and detained on his lawn while the officers performed a protective sweep of the house. (Tr. 17-19, 42). During the protective security sweep, two officers remained with Defendant. (Tr. 42). Even with Defendant outside, the officers considered the situation to be dangerous because they were concerned that someone else

11

could have been in the home with a firearm.  (Tr. 17).  After the officers swept through the house, they performed a secondary, more methodical and slow search of the residence where they checked attics, under the beds, and behind clothes.  (Tr. 18).  The second security sweep took another thirty seconds to a minute.  (Tr. 18).

After the house was cleared, five agents remained to process the scene and collect evidence.  (Tr. 18).  Agent Moye and other agents were heading to a different home where Israel Vega-Perez, Defendant's son, resided in order to execute a seizure warrant and arrest warrant for Israel Vega-Perez.  (Tr. 18-20).  Agent Moye then motioned for Task Force Officer Robert Keim ("TFO Keim"), who is employed with the Cherokee County Sheriff's Office and has served as a Spanish translator since 2003, to come inside.  (Tr. 18-19, 56-57).  At this time, Defendant, who was seated to the right of the front door with his back towards the house, was brought inside the house, and was placed on the couch after it was searched.  (Tr. 19).  Defendant's hands remained handcuffed behind his back and he was wearing only his underwear.  (Tr. 19-20, 43).  Defendant appeared to be in good physical condition and between fifty to fifty-five years old.  (Tr. 44).  Agents had their weapons unholstered, but none were pointed at Defendant.  (Tr. 19).  No agents made any physical contact with Defendant at the time.  (Tr. 21).  Agent Moye left the residence at approximately 6:20 a.m.  (Tr. 21).

TFO Keim obtained a 202 booking form and walked into the living room to talk with Defendant.  (Tr. 63).  TFO Keim explained to Defendant in Spanish that he needed to collect some routine information.  (Tr. 64).  According to TFO Keim, Defendant

12

appeared to understand him and offered responsive answers to TFO Keim's questions. (Tr. 64).  Because the living room was such a centralized location and officers had set up an area to collect the evidence in the adjacent dining room, TFO Keim concluded that it would be better to move to an area where Defendant could not see the evidence being collected and could better hear TFO Keim.  (Tr. 64).  Defendant was allowed to put on his jeans and a t-shirt.  (Tr. 65).  TFO Keim then moved Defendant to the basement.  (Tr. 65-66).

Once in the basement, there was at least five feet between TFO Keim and Defendant.  (Tr. 67).  TFO Keim elicited the following information from the Form 202 booking form ("Form 202"): subject's name, date of birth, social security number, place of birth, citizenship, ethnicity, sex, hair color, height, eye color, weight, nicknames, scars, marks,  tattoos, address, telephone number, occupation, vehicle, driver's license, passport, family information, father/mother's name, if he was married, girlfriend/boyfriend, and children.  (Tr. 68-69).  TFO Keim asked Defendant if he had a job, and Defendant responded that he did not.  (Tr. 69).  TFO Keim then said, "Other than a drug dealer."  Defendant responded, "Just a little one." (Tr. 69).  TFO Keim did not ask any follow up questions.  (Tr. 69).  TFO Keim asked the questions in a casual tone of voice and it took about five to ten minutes to complete the questioning.  (Tr. 70). Defendant answered the questions in a way that was responsive to the questions asked and did not appear to under the influence of drugs or alcohol.  (Tr. 70).

While TFO Keim waited for Special Agent Moye to return to the residence,

records were located within the residence that were in the name Humberto Vega-Gutierrez, which was not the name by which the Defendant originally identified himself to TFO Keim. (Tr. 71). Although Defendant initially identified himself as Adolfo Santana, when TFO Keim asked Defendant about the name on the records, Defendant admitted that he was in fact, Vega-Gutierrez. (Tr. 70-71). TFO Keim then asked for another Form 202, and re-asked Defendant all of the questions on the form. (Tr. 72). TFO Keim testified that he asked Defendant a second time if he was a drug dealer and Defendant stated that he was "a little one." (Tr. 72). It took approximately five minutes to cover all of the questions on the Form 202 again. (Tr. 73). During the second conversation, a chair was brought down by another agent or task force officer because Defendant had been standing up until that point. (Tr. 73).

Agent Moye returned to the residence at about 7:30 a.m. in order to interview Defendant. (Tr. 22). Agent Moye was wearing gray BTU pants, bottoms, and a green top with a gray vest. (Tr. 75). By this time, Defendant was wearing jeans and a black shirt. (Tr. 44). The interview also took place in the basement of Defendant's home. (Tr. 22-24). This time, Special Agent Moye was present with TFO Keim, Intelligence Analyst Manalli Ghandi, TFO Lisa Vorrasi,[5] and Analyst Lindsay Harris. (Tr. 22, 24). Moye's firearm was visible, but holstered to his leg. (Tr. 50, 75). Defendant was seated in the only chair in the room with his hands cuffed in front of him. (Tr. 24). There were no lights in the basement, but there were two windows which provided sunlight. (Tr.

---

[5]   In the transcript of the evidentiary hearing, TFO Vorrasi's last name is incorrectly spelled as Burossi.

22).  TFO Keim was clad in blue jeans, boots, and a T-shirt, but his weapon was not visible.  (Tr. 25, 63).  TFO Vorrasi, who was wearing khaki pants and a GBI police shirt, stood to the left of TFO Keim with her weapon holstered.  (Tr. 26).  Analyst Ghandi, who was wearing khaki BTU pants and a black GBI police shirt and did not carry a firearm, stood out of view in the background near the steps leading down to the basement.  (Tr. 25, 75-76).  Analyst Harris, also unarmed, wore khaki pants with a black T-shirt with Atlanta HIDTA on it and stood next to Agent Moye.  (Tr. 26, 75-76).  Keim, Vorrasi, Moye, and Harris stood in a semi-circle around Defendant, at least three or four feet away from him.  (Tr. 26-27, 74).

Moye perused the Form 202 TFO Keim completed and then obtained a voice exemplar from Defendant.  (Tr. 27, 76-77).  In order to obtain a voice exemplar, Agent Moye telephoned the Atlanta Field Division and had a Spanish speaking monitor ask nine or ten questions in Spanish for about a minute and forty-seven seconds while Moye held the phone to Defendant's ear.  (Tr. 27-28).  TFO Keim explained to Defendant in Spanish before the call that Agent Moye would make a telephone call and instructed Defendant to answer the questions from the monitor in Spanish.  (Tr. 29).  Defendant said okay. (Tr. 74).  Defendant was not given an option about whether he would provide a voice exemplar.  (Tr. 50, 91 (TFO Keim does not recall giving Defendant an option to participate in the voice exemplar)).  The questions included what was Defendant's name, how old was he, where he lived, whether he was married, and where he was from.  (Tr. 29).

15

After the voice exemplar was completed, TFO Keim read Defendant his <u>Miranda</u> warnings in Spanish.  (Tr. 30, 76-78; Gov't's Ex. 3).  After each line of the <u>Miranda</u> warning, TFO Keim asked Defendant if he understood and Defendant responded, "Si." (Tr. 47, 78-79).  After Defendant agreed to answer questions without an attorney present, Agent Moye asked him his name, his date of birth, his address, his telephone number, where he was from, where he was born, and how long he had been living in the United States.  (Tr. 31, 79-80).  Agent Moye asked all of the same questions that were on the Form 202 to learn whether there would be discrepancies in Defendant's answers.  (Tr. 48).  One of the questions on the Form 202 is the Defendant's occupation.  (Tr. 48). According to TFO Keim, he asked Defendant on behalf of Special Agent Moye about "Mr. Vega's occupation as a dealer."  (Tr. 90).  Special Agent Moye also asked Defendant about  drugs or crystal meth found in the kitchen area, who supplied him, the telephone number for his supplier, how long he had lived at 1508 Colony Court, who paid the rent, how much the rent was, to whom he sold drugs, and questions about a gun that had been found.  (Tr. 31).  Special Agent Moye believed Defendant was being very vague and untruthful.  (Tr. 31).

Before the conclusion of the interview, Defendant requested to go to the bathroom. (Tr. 31-32).  While en route, Special Agent Moye held on to Defendant's arm to better defend if he tried to grab an agent's gun or "do something crazy."  (Tr. 32).  Defendant was permitted to use the restroom while the bathroom door was open and Special Agent Moye waited outside.  (Tr. 32).  Special Agent Moye then accompanied Defendant back

to the basement area and Defendant sat down in the chair in the basement and the interview continued.  (Tr. 32).

At the end of the interview, Defendant complained of a headache and wanted to take some medicine that he said he did not take that morning.  (Tr. 34).  Special Agent Moye advised Defendant to give him a moment and his issue would be addressed.  (Tr. 34).  Special Agent Moye then asked Defendant about money the law enforcement officers seized and explained to him that they were seizing the money, and that if he wanted to lay claim to the money, he needed to sign the bag as the owner or possessor of the money.  (Tr. 34).  Defendant agreed to do so and signed the bag.  (Tr. 34).

Defendant accompanied Special Agent Moye upstairs to a table where Defendant said his medicines were located.  (Tr. 34-35).  Special Agent Moye requested that Defendant point out what medicines he needed to take, and Defendant pointed to some medicine bottles with his name on them as well as two tan medicine bottles which had no name on them.  (Tr. 35).  Special Agent Moye did not feel comfortable taking the unmarked bottles with him and had TFO Keim explain to Defendant that Special Agent Moye would not administer any medicines on the scene.  (Tr. 35).  Defendants medications were transported with him and once he completed intake into the Marshal's Department he could see a doctor who could administer whatever medicines that were prescribed for him.  (Tr. 35).  Special Agent Moye states that Defendant still appeared to be of sound mind even though he had not taken his medications.  (Tr. 36).  TFO Keim also testified that Defendant did not appear to be impaired in any way even though he

17

had not taken medication for his headache. (Tr. 83).

During the interview, Special Agent Moye's tone of voice remained calm, normal, and conversational. (Tr. 32, 81). TFO Keim's voice also remained conversational while he translated. (Tr. 33, 81). No one yelled or screamed at Defendant, and he remained calm and quiet during the interview. (Tr. 33, 81). Defendant appeared to understand the questions asked by TFO Keim, but appeared to be reluctant to provide as much information as he could. (Tr. 33, 80-82). Defendant never asked for the questioning to stop and never asked for a lawyer. (Tr. 36, 82). Special Agent Moye and TFO Keim both testified that no one made any promises to Defendant, threatened him, displayed their firearms, or physically touched him during the interview. (Tr. 36-37, 83-84). The interview lasted about fifteen minutes and was not recorded. (Tr. 51, 81).

## II.   <u>LEGAL ANALYSIS</u>

Defendant contends that his statements he made during the search of his home should be suppressed because he was interrogated by TFO Keim while he was in custody but was not given <u>Miranda</u> warnings. Defendant reasons that TFO Keim, who knew he would be talking to someone about drug trafficking, should not have questioned him about his occupation without first providing <u>Miranda</u> warnings and should have known that the comment about whether Defendant had an occupation other than drug dealer was likely to elicit an incriminating response. According to Defendant the fact that he was subsequently asked the same questions after TFO Keim read him <u>Miranda</u> warnings does not excuse the initial failure to provide <u>Miranda</u> warnings. Thus, Defendant argues his

18

subsequent statements were tainted by the initial wrongdoing.  Finally, Defendant contends that under the totality of the circumstances, all of his statements were coerced. In support, Defendant points out that there were twelve agents lined up at his door with rifles and semi-automatic weapons drawn yelling at him in both Spanish and English; he was seventy years old at the time with a glazed look on his face; he was pulled outside in his underwear and made to sit on the lawn; he  remained handcuffed, he was not told why law enforcement agents were at his house or that TFO Keim's questions were optional; and he was instructed to participate in a voice exemplar without being told that he could decline.

### A.   Pre-Miranda Statements

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial.  U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000).  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations.  Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress' attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient).  The "Miranda safeguards come into play whenever a person in custody[6] is subjected to either express questioning or its

---

[6] Here, the Government does not dispute that Defendant was in custody while TFO Keim questioned him.  A defendant is in custody for purposes of Miranda when there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  United States v. Brown, 441 F.3d 1330, 1347 (11th

19

functional equivalent." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of express questioning occurs when officers use "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301.

In this case, the majority of the questions that TFO Keim asked Defendant amount to routine biographical questions which are not considered interrogation. Express questioning, when it is not likely to elicit an incriminating response, might not be considered interrogation as contemplated by the Court in <u>Miranda</u>. In this vein, law enforcement questions pursuant to routine booking procedures are not considered interrogation within the meaning of <u>Miranda</u> where they are not intended to elicit information for investigatory purposes. <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 600-01 (1990). Under the routine booking exception, routine booking questions, such as those regarding a defendant's age, height, weight, eye color, name, and current address, are "reasonably related to the police's administrative concerns," and therefore exempt from <u>Miranda</u>'s reach. <u>Muniz</u>, 496 U.S. at 601; <u>United States v. Muhammad</u>, 196 F. App'x

_____

Cir. 2006) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted)). Using an objective test, a court will find a defendant in custody if "under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement . . . to such extent that he would not feel free to leave." <u>United States v. McDowell</u>, 250 F.3d 1354, 1362 (11th Cir. 2001). Here, Defendant was handcuffed and placed in an area where the law enforcement officers controlled his movements and kept an eye on him. (Tr. 17-19, 32, 42-43, 65-66). Additionally, the law enforcement officers were executing a warrant for Defendant's arrest. (Tr. 4-5). Accordingly, Defendant was in custody.

882, 884 (11th Cir. 2006); United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991) ("An officer's request for routine information for booking purposes is not an interrogation under Miranda, even though that information turns out to be incriminating."). Here, the majority of the questions TFO Keim asked Defendant were routine booking questions, such as, for instance, Defendant's name, address, sex, hair color, height, eye color, and weight. Defendant has not made any specific argument that these types of questions do not fall within the routine booking exception. Instead, Defendant focuses his argument regarding his unwarned statements on the two occasions in which TFO Keim asked about Defendant's occupation and suggested that Defendant was a drug dealer. (Def.'s Br. 10-11; Def.'s Reply 4).

TFO Keim's comments suggesting that Defendant was a drug dealer are not routine booking questions and amounted to interrogation. Questions that are reasonably likely to elicit an incriminating response may breach the booking exception. United States v. Glen-Archila, 677 F.2d 809, 816 n.18 (11th Cir. 1982) (reiterating that police may not use routine biographical questioning as a guise for obtaining incriminating information and that even questions that are usually routine "must be proceeded by Miranda warnings if they are intended to produce answers that are incriminating"); United States v. Corey, 861 F. Supp. 2d 1341, 1344 (S.D. Fla. 2012) (citing Muniz, 496 U.S. at 602 n.14), aff'd, 521 F. App'x. 759 (11th Cir. 2013). An incriminating response is defined as "any response–whether inculpatory or exculpatory–that the prosecution may seek to introduce at trial." United States v. Lopez-Garcia, 565 F.3d 1306, 1316-17

(11th Cir. 2009). This Court agrees with Defendant that TFO Keim's question about whether Defendant had a job "other than a drug dealer" was designed to elicit an incriminating response. (Tr. 69). While a question about a suspect's occupation may normally qualify as a standard booking question, the manner in which the question was asked in this case crossed the line from routine into investigative. See, e.g., United States v. Sanchez, 817 F.3d 38, 45 (1st Cir. 2016); United States v. Gotchis, 803 F.2d 74, 79 (2d Cir. 1986). Here, TFO Keim testified: "I asked him if he had a job. He told me no. And I made the statement 'other than a drug dealer.' And he said, 'just a little one,' and motioned with his hands . . . ." (Tr. 69). Thus, TFO Keim had already received the answer to the biographical question about the Defendant's occupation and learned that Defendant was not employed before he made the comment "other than a drug dealer." (Tr. 69). TFO Keim had the information he needed to complete the question about occupation on the Form 202 booking form when Defendant told TFO Keim that he was not employed. Accordingly, the Court cannot conclude that the question was a routine biographical question at that point.

Furthermore, it appears that TFO Keim's comment was designed to elicit an incriminating response because TFO Keim basically accused Defendant of being a drug dealer as part of a question that Defendant had already answered. Under such circumstances, it would be a natural and expected response for Defendant to either defend himself, minimize his role, or realize that he was caught and own up to being a drug dealer. In such a situation, a suspect could easily be expected to make an

22

incriminating response.  <u>United States v. Pena</u>, 897 F.2d 1075, 1082 (11th Cir. 1990) (concluding that where the government informed the defendant that marijuana had been recovered, it elicited the defendant's exclamations of regret), <u>abrogated on other grounds by</u> <u>Davis v. United States</u>, 512 U.S. 452 (1994).

Likewise, the second time that TFO Keim insinuated that Defendant was a drug dealer during TFO Keim's second round of asking the questions on the Form 202 booking form also crossed the boundary of routine booking question into investigatory question.  This time, TFO Keim directly asked Defendant if he was a drug dealer and did not bother with the routine question about his occupation.  Clearly, TFO Keim's question in this regard was investigatory.  TFO Keim had a duty to give Defendant <u>Miranda</u> warnings before asking these investigatory questions.   Accordingly, Defendant's responses to TFO Keim's two accusations that he was a drug dealer should be suppressed.[7]  <u>Oregon v. Elstad</u>, 470 U.S. 298, 309 (1985) (explaining that <u>Miranda</u> requires that an unwarned statement must be suppressed); (Tr. 69, 72).

**B.**   **Post-Miranda Statements**

Defendant also argues subsequent statements he made during the interview conducted by Special Agent Moye should also be suppressed because (1) they were coerced by the law enforcement officers' show of force and (2) they are tainted by the police wrongdoing when he made his un-mirandized statements about his occupation to TFO Keim.

---

[7]  The Government concedes that Defendant's unwarned statement about being a drug dealer was inadmissible.  (Gov't Br. 29).

23

1.  <u>Defendant's Statement Were Voluntary</u>

Defendant contends that under the totality of the circumstances his statements were coerced because there were twelve agents lined up at his door with rifles and semi-automatic weapons drawn yelling at him in both Spanish and English; he was seventy years old and had a glazed look on his face; he was pulled outside of his house in his underwear and required to sit on the lawn; he remained handcuffed; he was not told why law enforcement agents were at his house or that Keim's questions were optional; and he was instructed to participate in a voice exemplar without being told that he could decline.[8]

This Court finds Defendant's statements were voluntarily given.  When the government seeks to use a confession obtained through custodial interrogation against a defendant, the government must demonstrate that the defendant voluntarily, knowingly, and intelligently waived his Fifth Amendment rights under <u>Miranda</u>.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 475 (1966); <u>Hart v. Florida</u>, 323 F.3d 884, 891 (11th Cir. 2003). Whether a waiver was voluntary, knowing, and intelligent presents a two-fold inquiry. Courts assess the voluntariness of the defendant's relinquishment of his rights to see if

---

[8] Although Defendant highlights the fact that Special Agent Moye obtained a voice exemplar prior to the time he was given <u>Miranda</u> warnings, suspects can be compelled to provide a voice exemplar which solely measures the physical properties of the witnesses' voices and not for the testimonial or communicative content of what was to be said, without running afoul of the Fourth, Fifth, or Sixth Amendments. <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 592 (1990); <u>United States v. Dionisio</u>, 410 U.S. 1, 14-15 (1973); <u>Everett v. Sec'y, Fla. Dep't of Corr.</u>, 779 F.3d 1212, 1243 (11th Cir. 2015); <u>United States v. Acosta</u>, 807 F. Supp. 2d 1154, 1187 (N.D. Ga. 2011); <u>United States v. Cerpas</u>, No. 1:07-CR-279-CAP-GGB-33, 2009 WL 10677437, at *3 (N.D. Ga. Mar. 6, 2009).

"it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also Hart, 323 F.3d at 892. The court must find government coercion to conclude that a waiver was involuntary. "Absent police conduct causally related to the confession, there is . . . no basis for concluding that any state actor has deprived a criminal defendant" of his rights. Colorado v. Connelly, 479 U.S. 157, 164 (1986); United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995). To determine whether the relinquishment was knowing and intelligent, courts must determine whether the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Burbine, 475 U.S. at 421. A court may only hold that a defendant validly waived his Fifth Amendment rights under Miranda if it finds that "the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." Id.

The totality of the circumstances test takes into consideration "both the characteristics of the accused and the details of the interrogation" to determine whether police conduct was causally related to the confession. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); see also Haynes v. Washington, 373 U.S. 503, 513 (1963); Reck v. Pate, 367 U.S. 433, 440 (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"). The court reviews numerous factors under this analysis, including the accused's intelligence, education, age, drug and alcohol use, psychological problems, and prior experience with the criminal justice system, as well

25

as the length of the detention, the nature of the interrogation, the application of physical force or the threat thereof, and the use of a promise or inducement by police. Hubbard v. Haley, 317 F.3d 1245, 1252-53 (11th Cir. 2003) (citing Garcia, 890 F.2d at 360).

In this case, while there was an initial show of force by law enforcement officers entering and securing Defendant's residence, placing Defendant in handcuffs, and taking Defendant into custody, the circumstances under which the interview of Defendant took place did not involve the same show of force. When law enforcement officers initially made entry into the residence, twenty-five law enforcement officers were present on the scene. After the residence was secured, however, five agents stayed at the house to process the scene and collect evidence and many of the other officers prepared to leave for another search at another residence. (Tr. 18). Although Special Agent Moye testified that Defendant wore a glazed look on his face after the officers' initial entry into the residence around 6:00 a.m., the post-Miranda interview took place almost an hour and a half later and Defendant appeared to be in good physical condition and did not appear to be impaired in any way. (Tr. 5-6, 12, 22, 36, 41-42, 83). While the twelve officers who initially entered the residence had their guns drawn and eventually placed Defendant on his front lawn in his underwear with his hands cuffed behind his back, at the time of the post-Miranda warnings interview, there were only five officers present in the basement where Defendant was interviewed, they did not touch Defendant and kept three or more feet away from him, the three officers who had weapons kept them holstered, Defendant's hands were cuffed in the front instead of the back, and Defendant was

26

wearing jeans and a t-shirt.   (Tr. 17-20, 22-26, 36-37, 42-43, 50, 63, 65, 67, 74-76, 83-84).  During the interview, Agent Moye and TFO Keim's voice remained conversational and no one yelled at, screamed at, or threatened Defendant.  (Tr. 33, 81).  Likewise, Defendant did not seem coerced or cowed by the presence of the law enforcement officers or the circumstances of his arrest earlier in the day.  When Defendant needed to go to the restroom or take medications, he requested that the law enforcement officers allow him to do so.  (Tr. 32, 35).  Additionally, far from Defendant's will being overborne by the circumstances, both TFO Keim and Special Agent Moye credibly testified that Defendant did not appear to be particularly forthcoming during the interview.   (Tr. 31, 81).   Thus, in this Court's view, under the totality of the circumstances, Defendant's Mirandized statements were the product of his own free will and not obtained via coercion.   Therefore, Defendant's statements after Miranda warnings were given were voluntary.   See, e.g., United States v. Vanbrackle, 397 F. App'x 557, 562-63 (11th Cir. 2010) (confession was voluntary even though eight law enforcement officers had participated in the execution of a search warrant, some of whom had their guns drawn upon entry, because no gun was drawn during the interview, officers did not threaten defendant, during the interview, defendant was not handcuffed, defendant had been informed of his rights and consented to be interviewed, and interview took place in the home); United States v. Johnson, 379 F. App'x 964, 968-69 (11th Cir. 2010) (explaining that even though defendant had been arrested earlier in the day after officers had battered the door to enter his home while his children were crying,

he and his wife had been handcuffed, and his home was searched because confession occurred at least thirty minutes after the officers' forceful entry, coercive circumstances were not present during the interview, and defendant had been given <u>Miranda</u> warnings); <u>United States v. Blackman</u>, 66 F.3d 1572, 1577-78, 1580 (11th Cir. 1995) (holding that defendants' statements were voluntary although earlier that day their apartment had been surrounded by ten to twelve armed FBI agents, they had been asked to exit their apartment, and they were handcuffed, taken into custody, taken to the front of the apartment, and forced to lay down on the ground); <u>Shriner v. Wainwright</u>, 715 F.2d 1452, 1455-56 (11th Cir. 1983) (explaining that defendant's confession was not coerced even though he was handcuffed and held in a small room except for trips to the lavatory, the interrogation lasted five hours, and his girl friend was present in an adjacent room in an emotionally distraught state because he knowingly and involuntarily waived his <u>Miranda</u> rights and no one threatened him or promised him in exchange for the confession).

2.   <u>Defendant's Subsequent Statements Were Not Tainted</u>

Defendant further contends that the fact that he was subsequently asked the same questions after TFO Keim read him <u>Miranda</u> warnings does not excuse the failure to provide <u>Miranda</u> warnings because the failure to initially Mirandize him during questioning by TFO Keim taints his subsequent Mirandized statements. This Court disagrees that Defendant's un-Mirandized statements regarding his occupation taints subsequent Mirandized statements made to Special Agent Moye. When a defendant

28

makes a pre-<u>Miranda</u> statement that is subject to suppression due to the failure to provide <u>Miranda</u> warnings, the taint does not necessarily transfer to subsequent statements made after the defendant has waived his <u>Miranda</u> rights if the first confession was voluntary. <u>Elledge v. Dugger</u>, 823 F.2d 1439, 1443 (11th Cir. 1987) (explaining that confessions obtained by failing to honor a request to stop questioning is a technical violation of <u>Miranda</u>, but does not make the confession "involuntary" and they do not taint subsequent confessions); <u>Smith v. Wainwright</u>, 777 F.2d 609, 618 (11th Cir. 1985); <u>United States v. Harrold</u>, 679 F. Supp. 2d 1336, 1346 (N.D. Ga. 2009).  The Supreme Court has "rejected the claim that the simple failure to administer the <u>Miranda</u> warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." <u>United States v. Lopez-Garcia</u>, 565 F.3d 1306, 1318 (11th Cir. 2009) (citing <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985)).  Rather, the admissibility of subsequent statements turns on whether they are knowingly[9] and voluntarily made.  <u>Id.</u>; <u>United States v. Street</u>, 472 F.3d 1298, 1312-13 (11th Cir. 2006).

In this case, for the reasons discussed above, neither Defendant's unwarned statements made to TFO Keim, nor Defendant's subsequent Mirandized statements made during his interview with Special Agent Moye were coerced.  Although Defendant's

---

[9] Defendant, who verbally indicated that he understood each <u>Miranda</u> warning and agreed to answer questions without an attorney present, does note dispute that he knowingly waived his rights.  (Tr. 30, 76-80).

initial statements regarding being just a little drug dealer were elicited by TFO Keim closer in time to the law enforcement officers' forceful entry into the residence, the coercive factors present at the time of entry were no longer present during TFO Keim's initial unwarned questioning.  Prior to the interview, Defendant was relocated indoors and TFO Keim allowed him to put on jeans and a t-shirt; TFO Keim, also dressed in blue jeans and a t-shirt, asked Defendant questions in a casual tone of voice; TFO Keim did not display his weapon and kept it holstered in the small of his back underneath his t-shirt; and TFO Keim stood at least five feet away from Defendant while he questioned him.  (Tr. 63, 65, 67, 70, 74).  Defendant did not appear to be under the influence of drugs or alcohol, Defendant's answers to TFO Keim's questions were responsive, all of TFO Keim's interview pursuant to the Form 202 totaled approximately fifteen minutes, and Defendant appeared to understand TFO Keim.  (Tr. 69-70, 73).  Because both Defendant's initial unwarned statements to TFO Keim during the completion of the Form 202 and the subsequent warned statements obtained during the interview by Special Agent Moye were both voluntary, "there is no justification for suppressing the 'highly probative evidence of a voluntary confession.'" Street, 472 F.3d at 1313 (quoting Elstad, 470 U.S. at 312).

Defendant argues his subsequent statements obtained during Special Agent Moye's interview should be suppressed under Missouri v. Seibert, 542 U.S. 600 (2005), because there was a continuity of law enforcement personnel given that TFO Keim was present during all of the interviews TFO Keim twice asked Defendant the questions on

the Form 202 and then Special Agent Moye then again reviewed the answers with Defendant, and all of the interviews occurred in the basement with Special Agent Moye's interrogation beginning shortly after the conclusion of TFO Keim's questions.   The Supreme Court in <u>Missouri v. Seibert</u>, 542 U.S. 600 (2005), carved out an exception to the general rule that the admissibility of a subsequent statement following an unwarned statement should turn on whether the subsequent statement was knowingly and voluntarily made.  <u>Street</u>, 472 F.3d at 1313 (citing <u>Elstad</u>, 470 U.S. at 309-12).  The exception in <u>Seibert</u> "is aimed at putting a stop to the deliberate use of a particular police tactic employed for the specific purpose of undermining the <u>Miranda</u> rule."  <u>Street</u>, 472 F.3d at 1313.  "Because <u>Seibert</u> is a plurality opinion and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law."  <u>Street</u>, 472 F.3d at 1313.  Justice Kennedy found that "suppression of a post-warning confession is required if 'the two-step interrogation technique is used in a calculated way to undermine the <u>Miranda</u> warning."  <u>Street</u>, 472 F.3d at 1313-14.  The exception applies when "an officer employs a strategy of deliberately questioning an in-custody suspect without any <u>Miranda</u> warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession."  <u>Street</u>, 472 F.3d at 1313-14 (citing <u>Seibert</u>, 542 U.S. at 621).  Where officers employ such a strategy, "the post-warning confession is inadmissible unless the officer took specific curative steps to ensure that the mid-interrogation warnings achieved the purpose the <u>Miranda</u> decision intended."  <u>Street</u>, 472 F.3d at 1314 (citing <u>Seibert</u>, 542 U.S. at 621).  Potential curative

31

measures include a "substantial break in time and circumstance between the prewarning statement and the <u>Miranda</u> warning or an additional warning that explains the likely inadmissibility of the prewarning custodial statement." <u>Street</u>, 472 F.3d at 1314 (citing <u>Seibert</u>, 542 U.S. at 622). The Eleventh Circuit has reiterated, however, that such curative measures are only necessary "where the question first tactic has been used" and that otherwise, the "general rule that post-warning statements are admissible, even where they follow pre-warning statements that are not, governs." <u>Street</u>, 472 F.3d at 1314. In determining whether the two-step interrogation tactic was used, the totality of the circumstances are considered, including "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements." <u>Street</u>, 472 F.3d at 1314.

This Court concludes that the interrogation techniques used here were not done in a calculated way to undermine Defendant's <u>Miranda</u> warning. While the interviews conducted by TFO Keim and Special Agent Moye both occurred in Defendant's basement, the remaining circumstances do not support the conclusion that the two-step interrogation tactic was used in this Court's view. (Tr. 22-24, 65-66). Rather than fully investigating information relevant to Defendant's alleged criminal activity without <u>Miranda</u> warnings, TFO Keim limited the subject matter of his interview questions to the routine information to be elicited on the Form 202. (Tr. 68-69, 70-72; Gov't's Ex. 2). Although TFO Keim may have strayed into an investigative purpose when he questioned Defendant regarding his occupation "other than a drug dealer," TFO Keim did not delve

into questions regarding the crime of being a drug dealer.  Once TFO Keim was done asking the questions on the Form 202, TFO Keim waited for Special Agent Moye to interview Defendant.  (Tr. 70, 74).  Thus, there did not appear to be an overarching strategy of obtaining unwarned, incriminating statements.  Only when Special Agent Moye arrived did the interrogation extend to direct questions about Defendant's criminal activity, such as questions about the drugs or crystal meth found in the kitchen area, who Defendant's suppliers were and their telephone numbers, how long he lived at the residence, who paid the rent, how much the rent was, to whom he sold drugs, and questions about the gun which had been found. (Tr. 31).  While Special Agent Moye's interview did have some overlapping content with that of TFO Keim's since Special Agent Moye repeated some of the biographical questions asked by TFO Keim, there is no indication that Special Agent Moye's repeat questioning was designed to immunize Defendant's previous unmirandized testimony given during the interview with TFO Keim.  The majority of TFO Keim's questioning concerned only the biographical information which TFO Keim could legitimately ask without giving Defendant <u>Miranda</u> warnings.  For the most part, the questions designed to invoke an incriminating response were posited by Special Agent Moye only after <u>Miranda</u> warnings were read. Accordingly, this Court concludes that the exception in <u>Seibert</u> does not apply.  <u>Contrast Seibert</u>, 542 U.S. at 605-06, 610, 620-22 (finding that Mirandized statements following unwarned statements should be suppressed where first officer instructed a second officer arresting suspect not to Mirandize suspect, and then second officer asked suspect a series

33

of questions for about thirty or forty minutes without reading the suspect <u>Miranda</u> rights, obtained a confession, then turned on tape recorder, gave the suspect <u>Miranda</u> warnings, obtained a waiver of rights from her, and then confronted witness with her prewarning statements and arresting officer admitted that he was resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question until the suspect gives the answers she had already provided) <u>with</u> <u>United States</u> <u>v. Lopez-Garcia</u>, 565 F.3d 1306, 1319 (11th Cir. 2009) (rejecting the application of the exception in <u>Seibert</u> where there was no suggestion that the failure to Mirandize defendant before the June 19 interview was somehow deliberate or strategic); <u>Street</u>,472 F.3d at 1314 (explaining no two-step interrogation technique had been utilized and thus, <u>Seibert</u> exception did not apply, where the initial questioning before full <u>Miranda</u> warnings was brief and general, and the agent did not withhold <u>Miranda</u> warnings, solicit a full confession, and then lead defendant through his confession again after <u>Miranda</u> warnings).   Accordingly, Defendant's Motion should be **DENIED** as to statements obtained by Special Agent Moye.

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's Motion to Suppress Evidence Seized Pursuant to Warrant should be **DENIED**.  (Doc. 140).  Defendant's Renewed Motion to Suppress Statements should be **GRANTED IN PART AND DENIED IN PART**.  (Doc. 141).  Because there are no more motions or other matters to address for Defendant Vega-Gutierrez, the undersigned certifies his case ready for trial.

34

**SO ORDERED, REPORTED AND RECOMMENDED** this __5___ day of November, 2018.

_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)